## HANSEN v. E. I. DU PONT DE NEMOURS & CO., Inc.

(District Court, W. D. New York. August 28, 1925.)

No. 1265.

**1. Shipping ⬦⟹54—Libelant could not recover on ground of misrepresentations as to character of cargo, where nature of cargo discoverable by reasonable care from inscription on boxes.**

In a libel to recover for destruction of tug and barges demised for carriage of cordite and powder, *held*, that libelant's recovery could not be predicated on misrepresentations as to nature of cargo, or from failure to give warning, where its inflammable character was discoverable by the exercise of ordinary care and attention; it being presumed libelant was reasonably apprised of dangerous character of cargo, from inscription on boxes.

**2. Shipping ⬦⟹39—Agreement held to amount to demise of tug and barges, and not contract of hire and service.**

Verbal agreement entered into by agent of respondent with company owning tug and barges, followed by written charter specifying rental of tug and barges from time of departure until return after delivery of cargo, mentioning that extra coal was to be supplied by charterer, charterer to assume all risks, *held* to amount to a demise of tug and barges pro hac vice, and not a contract for use and hire, and fact that captain of tug, engineer, and bargemen were employed by owner did not alter case, since their services went with demise of vessels.

**3. Shipping ⬦⟹58(2)—Respondent company liable for negligence of agent in care of cargo of powder and resulting damage, where evidence showed such agent in complete charge.**

In libel for destruction of tug and barges, evidence *held* to show that agent of respondent company had entire management and control of barges for trip for which they were procured, and respondent company was consequently liable for his negligence in care of cargo and for his incompetence, which resulted in destruction of tug and barges by ignition of cargo containing cordite and powder.

**4. Shipping �köm53—Where charter provided risk on cargo to be assumed by charterer, shipowner released from all responsibility for negligence in care and protection of cargo and negligence of employés.**

Where charter agreement demising use of tug and barges provided charterer was to assume all risk on cargo, *held*, that wording implied a release of shipowner's responsibility for negligence in care and protection of cargo and for negligence of its employés.

**5. Shipping �köm58(2)—Evidence held to show lack of care in protection of cargo of powder.**

In libel for destruction of tug and barges from ignition of cargo of cordite and powder, evidence *held* to show that there was a failure by respondent to exercise proper care for the protection of the cargo, where it was shown that broken and split cases, exposing powder and cordite, were stowed without covering and a gasoline engine was permitted to be spiked to a case of powder.

**6. Shipping ⊊⊃58(2)—Evidence held to show exposed condition of powder cargo and use of backfiring gasoline engine were cause of destruction of tug and barges.**

In a libel for destruction of tug and barges, resulting from ignition of cargo of smokeless powder and cordite, *held*, that exposed condition of cargo and use of a backfiring gasoline engine, which was spiked to case of powder, were primary causes of disaster.

**7. Explosives ⊊⊃7—Transporting cargo of powder and cordite in manner not in conformity with state Labor Law negligence.**

Under Labor Law N. Y. § 450, powder is classified as an explosive, and such matter should be securely inclosed in containers in transporting same, without permitting any grains to protrude or remain on outside of containers, and failure to comply with provisions of state law in this respect was an act of negligence.

**8. Shipping ⊊⊃54—Defense that barge was unseaworthy, as defense to libel for destruction thereof, without merit, where respondent knew of condition at time of charter.**

In a libel for destruction of tug and barges, caused by ignition of cargo of smokeless powder and cordite, defense that barge in question was unseaworthy was without merit, where respondent knew of condition at time of charter.

In Admiralty. Libel by Emil Hansen, permanent receiver of the Syracuse Sand Company, Inc., against E. I. Du Pont de Nemours & Co., Inc., to recover for loss of boats by fire. Decree entered for the libelant, providing for the appointment of a commissioner to take proof of loss and damage and report to court.

Hancock, Dorr, Spriggs & Shove, of Syracuse, N. Y. (Bigham, Englar & Jones, of New York City, and E. L. O'Donnell, of Utica, N. Y., of counsel), for libelant.

Bond, Schoeneck & King, of Syracuse, N. Y., for respondent.

HAZEL, District Judge. On June 10, 1922, a concrete scow, which was engaged by respondent, the E. I. Du Pont de Nemours Powder Co., Inc., to transport smokeless powder and cordite, which is a form of smokeless powder, from May's landing, N. J., to Buffalo, N. Y., via the New York State Barge Canal, was sunk near Rome, and Kavenaugh, an employee of the respondent company, connected with its traffic department, was thereafter sent to supervise unloading of the cargo, contained in boxes, from the sunken scow into other canal boats for forwarding to Buffalo, from whence it was to be taken to its final destination at Bordale, Wis., where respondent operates a manufacturing plant.

Kavenaugh, on arriving at Rome, negotiated, by telephone, with the Syracuse Sand Company, Inc., libelant's predecessor, which was owner of the tug William P. Donnelley and canal barges Alice Clark and Oddfellow, to procure boats for the intended purpose. Afterwards the powder was transferred to the canal boat Clark (so called for short), Oddfellow, and Wright, the latter being owned by another and not involved herein. There are conflicting versions of the conversation over the telephone, between Kavenaugh and Cross, the president of the Sand Company; but an understanding was finally reached, which resulted on June 18th in the delivery of the boats in question to Kavenaugh. They were placed alongside the sunken scow for loading, and on the day following a written charter was signed, which, libelant claims, was a demise of the tug Donnelley and the two barges named, but which respondent claims to have been a simple contract for hire and service.

The Clark leaked some during the loading operation. Her leaky condition was known to Kavenaugh when the charter was signed by him as agent for respondent. The expenses of transferring the cargo were borne by respondent. The loading is claimed to have been carelessly done by the laborers under the supervision of Kavenaugh, in that many cases or boxes containing smokeless powder were open, and the contents exposed and strewn about in the holds and on the boxes, and especially in the Clark, and particles on her deck. Repairs concededly were made on some of the broken boxes and cases, but it is nevertheless proven that there were cracks in many cordite cases, through which grains could be seen.

To properly stow the 5,200 cases of smokeless powder, and keep the contents intact and unexposed, was an important thing to do. The metal boxes in which the smokeless powder was contained were 3½ feet in length, 15 inches thick and wide. The wood cordite boxes were 18 inches square and 36 inches long. It required five days to transfer the cargo. The Clark was loaded first, and then taken to a mud bank at New London, not far from Rome, to allow the mud to sink into her crevices to stop her leakage, and upon loading the other barges all three were taken in tow by the tug and proceeded westward.

Two gasoline engines had been obtained for pumping out the Clark whenever necessary. Upon arriving on Sunday, at 2 p. m., at Sylvan and Verona Beaches on Lake Oneida, where the canal continues into the lake, the tow was moored to the dock. The Clark was made fast on the outside of the other two boats, while the tug lay abreast of the Clark. The trip was halted because the wind was pretty strong, and Capt. Van Order of the tug believed the Clark was not in good condition for safely crossing the lake, as she repeatedly required pumping or siphoning water out of her hold, and he thought it advisable to delay crossing the lake until the next morning.

One of the gasoline engines had already been used at this time, and was spiked to a case of powder. The evidence shows that Kavenaugh had been asked by Greene, engineer of the tug, and Perkins, a boatman on the Clark, at New London, whether it was all right to fasten the engine on top of a case of smokeless powder, and he replied in the affirmative. According to his admission, he had repeatedly stated the powder was not dangerous, except from fire. There were many persons at the nearby beaches and vicinity, not far from where the tow was moored. Cross was then on the bridge near the canal entrance to the lake, accompanied by several friends, and later he went aboard the Clark. There were other persons near the dock and on the bridge. Cross and his wife and friends, after visiting the barges for awhile, left, but Cross and Bentley returned to them at about 5 o'clock, shortly before the disaster. The Clark was siphoned out by the tug while Cross was aboard earlier in the afternoon, and upon his second visit the engineer of the tug and boatmen were getting ready one of the gasoline engines in anticipation that it might be necessary to do some pumping while crossing the lake. In such case it would be necessary, it was believed, to use a gas engine, instead of a hand pump, as siphoning from the engine of the tug would not be feasible, for in crossing the lake the tug would be engaged in towing on a long hawser.

The witnesses Greene, Van Order, and Wentworth were testing the gas engine when Cross and Bentley arrived. Cross was not in charge of the operation, but concededly gave assistance in trying to make the pump work. They all testify that the gasoline engine was on the bow of the Clark, spiked to a case of powder, not far from the hatch where the top layers of the cargo were visible. Kavenaugh, they say, was about 15 feet away on the tug, near the pilot house, smoking a cigar, and Greene testified that he had said, and in this he was corroborated by others, that it was perfectly safe to run the gasoline engine on the case of powder. The engine was primed from a can of gasoline several times during the testing operation; the pump valve being dropped into the lake, instead of into the boat. The evidence convincingly discloses, as respondent claims, that the gasoline engine, which had no muffler, backfired several times prior to the mishap.

Onlookers were standing on the Sylvan Beach side of the lake, about 250 feet away, and on the bridge, about 150 feet away. They looked on idly and perhaps wonderingly; they saw and heard the backfiring, and three witnesses on the beach say they saw liquid dripping from the engine onto the case, and also saw blue flames from the engine at intervals. The wind was blowing some from the lake.

Kavenaugh testified that he had his back turned to the gasoline engine at this time, and was looking toward Sylvan Beach, listening to the music; but libelant's witnesses say that he was smoking a cigar, with his face turned toward the testing operation. Suddenly there was a flame, a spreading flame, followed by succeeding puffs and noises, and an explosion, libelant's witnesses say, while Kavenaugh says it was a mere burning and spreading of the fire. Every one aboard the barge and in the immediate vicinity precipitately ran in dread, and scattered in different directions for safety.

Greene, who had been assisting at the engine, was then standing on the dock with the suction hose of the pump in his arm, trying to fix it. He quickly ran across the barge to the tug to back her away from the fire. While doing so he saw his wife hurriedly passing the engine room door. He stopped

the engine and ran after her to the stern of the tug, where she had fallen. He picked her up and, for safety, leaped overboard with her. She was drowned, while he reached the shore. All the barges and the tug were totally destroyed. The intensity of the flame was such that the tug Betty, moored on the opposite side, about 200 feet away, and dwellings or buildings on the beach, were also destroyed by the flames.

This action was brought by the trustee in bankruptcy of the Sand Company to cover damages for the loss sustained. It is unnecessary to review the testimony at greater length. There are many discrepancies and contradictions. The testimony on both sides, relating to the improper loading into the barges, the asserted misrepresentations regarding the explosiveness of the powder, the claim that Kavenaugh smoked almost continuously while the boats were loaded, and his consent or acquiescence in the use of the gasoline engine spiked to a case of powder, is difficult to reconcile. Some of libelant's witnesses have a clear recollection of the details leading up to the holocaust, while others evidently have not narrated the incidents with exactness, and still others, no doubt, have exaggerated their observations. To determine that which is essential, resort must be had to the record in its entirety and the resultant probabilities.

The libel alleges that the Sand Company was induced to surrender the boats to Kavenaugh, owing to false representations made by him that the cargo was not dangerous; that, as the powder had been immersed in the canal, it was denitrated and would not explode or burn. Both Cross and Church, and various others, have supported these allegations, while Kavenaugh testified that he informed both Cross and Church of the nature of the cargo—i. e., that it was smokeless powder, and would not explode, but would burn rapidly. He denies stating that it had become denitrated or would not burn. There was testimony by expert witnesses for respondent that the powder, in fact, was not an explosive; that in its composition no combustible mixture was contained in such proportions as to produce concussion or an explosion upon coming into contact with fire (it was practically water-proof), and that it would ignite only on coming in contact with flame. Upon ignition, however, one of the experts says, the sudden uprush of gases would, no doubt, carry things into the air.

In opposition to this characterization of the powder, libelant's expert classified the cordite as a standard propellant of the British War Department and as an explosive. This opinion is supported by the débris that was carried in different directions immediately following the ignition, and by witnesses who described the noise of puffs in the air. It is quite believable that Kavenaugh failed to fully inform the Sand Company of the extreme inflammableness of the cargo, since, no doubt, he was anxious to obtain forwarding boats, and not improbably thought it unnecessary to emphasize its dangerous qualities. However that may be, the inscriptions on the cases in which the smokeless powder and the cordite was contained had upon them descriptive words, to wit, "Smokeless Powder" and "Cordite," indicating its character, and also words indicating the manufacturer and place of manufacture.

The witnesses who testified that Kavenaugh remarked that the powder was only good for fertilizer misunderstood him, I think, as it is unlikely that, if its condition had become absolutely harmless, he would have gone to the expense of recoopering various of the boxes; nor do I think that it is sufficiently shown that he replied that the cargo had become denitrated.

[1] Respondent's liability cannot be predicated upon any misrepresentations as to its character, or from failure to give warning, for its inflammableness was discoverable by the exercise of ordinary care and attention, and, indeed, it was fairly indicated by the inscriptions on the boxes. The presumption is warranted that the Sand Company was reasonably apprised of the dangerous character of the cargo. Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807; International Co. v. Fels (D. C.) 164 F. 337.

[2] The agreement between the Sand Company and Kavenaugh, in my judgment, was tantamount to a demise of the boats. It was not a contract of hire and service. The verbal arrangement entered into, by telephone, which was followed by the written charter (Exhibit 3), specifying the rental of the tug and barges from the time of departure until their return after delivery to Baldwinsville, and mentioning that extra coal would be supplied by the charterer, and, moreover, that the latter would assume all risks on the cargo, was a contemplated demise of the tug and barges, pro hac vice. Kavenaugh went with the cargo, no doubt, to protect it and insure its safe arrival at Buffalo, and his presence at the time of the mishap was not merely incidental. It makes no difference that the captain of the tug, the engineer, and the bargemen on the

Clark and Oddfellow, were employees of the Sand Company at the time of the charter, and paid for their work by it. Their services, as navigators, went with the renting or demise of the vessel. The point presented is fully covered by Dailey v. Carroll, 248 F. 466, 160 C. C. A. 476, The Willie, 231 F. 865, 146 C. C. A. 61, and Hastorf v. F. R. Long, 239 F. 852, 152 C. C. A. 638.

[3] Kavenaugh was consulted with reference to the tow stopping at Verona Beach, and about the gasoline engine being used to pump out the Clark. According to the weight of the evidence, he consented to testing the gasoline engine on the case of powder on the deck of the Clark, placed near the hatch, and where portions of the cargo in boxes were exposed. These were acts relating to the safety of the transported cargo, and it makes no difference that he did not direct the details of navigation, or that he was not on deck throughout the time the gasoline engine was tested. The evidence, in its entirety, establishes to my satisfaction that he had entire possession, management, and control of the barges for the contemplated trip to Buffalo. Accordingly, respondent company, for whom he acted, became liable for his negligence in the care of the cargo and for his incompetence resulting in the catastrophe.

[4] The Sand Company was not a common carrier, and, under the terms of the charter, was simply to deliver the boats to respondent's agent for a particular purpose. The wording of the charter, relating to assumption of risk on the cargo, implies, I think, a release of responsibility of the Sand Company from negligence in the care and protection of the cargo and negligence of the employees. It was in the contemplation of the parties that negligence of the bargemen and tug men must be attributed to respondent company, for during the voyage they were its servants. Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 53 L. Ed. 480; Bull v. N. Y. Co., 167 F. 792, 93 C. C. A. 182.

[5] There has been a great deal of testimony regarding the asserted negligent manner in which the cargo, consisting, as said, of about 5,200 cases, was loaded in the barges. It is clear, from this evidence, that Kavenaugh failed to exercise a proper degree of care in this particular. He failed to see to it that the cases were properly stored. The contents of the cases in many instances were exposed, and grains of cordite could be seen through openings. The witness

Holmes, who represented insurance underwriters, and several other witnesses for libelant, testified that about 100 to 150 fractured boxes and cases were loaded in the barges; some cases had been recoopered, but many others, which needed recoopering, were put aboard. Cordite was strewn about during the loading, and remained ungathered, or was not carefully swept up. There were split cases, through which the grains could be seen, stowed amidship and on the deck of the Clark. This condition was noticed by various witnesses on the afternoon proceeding the conflagration, and grains of cordite were also observed about the cases in the hold. There were cases only partly covered, stowed amidship on the Clark, and under her deck.

[6] To allow such a condition was a failure to exercise a proper care for the protection of the cargo, which its dangerous nature required. There were hatch covers on the concrete barges, which might have been utilized lengthwise to give some protection, even though they did not fit the hatch opening, and besides there was canvas available for covering, but only a little was used. In my judgment, the exposed condition of the cargo and the use of the gasoline engine, with its backfiring effect, were the primary causes of the disaster.

Libelant suggests that the fire was caused by a flame blown over from the pilot house of the tug to the cordite in the hatch from Kavenaugh's cigar; but this view, however careless it was to thus endanger the cargo, is too remote for acceptance. The admitted pouring of gasoline from a can to prime the gasoline engine confirms, I think, the observations of respondent's witnesses—Carrier, Eads, Mengel, Brooks, Loughlin, and Simpson. Some, as already mentioned, have testified that they saw drippings from the gasoline can onto the box upon which the engine was spiked; others, that they heard the backfiring at intervals and saw blue flames from the exhaust pipe a short time before the flame was seen to increase in volume; and it is also established that the position of the gas engine on the box was near the coaming of the hatch, and not forward on the deck, as testified by libelant's witnesses. There is no good reason for rejecting the graphic testimony of these witnesses, who, I think, were close enough to the Clark to observe the testing of the engine and the resultant flame.

Kavenaugh was derelict in his watchful-

ness and in the discharge of his duties of protecting the cargo entrusted to his care. He must have known, or should have known, that placing the gasoline engine on a case of powder, even though it had been immersed in the canal for several days, was a dangerous undertaking.

[7, 8] It is also urged as an act of negligence that the cargo was not transported in conformity with the Labor Law of the state (Consol. Laws N. Y. c. 31). By section 450 of the Labor Law smokeless powder is classified as an explosive, and in my opinion a reasonable interpretation of the provision includes the commodity with which we are herein concerned, since upon ignition by fire it was capable, by reason of the attendant gaseous pressure, to produce destructive effects upon life and property. The state law governed the transportation, inasmuch as the Interstate Commerce Commission had not at this time promulgated an appropriate rule for its interstate transportation.

As heretofore pointed out, the cargo was a highly inflammable substance; it was subject to sudden generation of highly heated gases, which might produce explosive effects, and should have been securely inclosed in containers without permitting any quantities, grains, or particles to protrude or remain on the outside. There was failure on the part of respondent, as already stated, to comply with the provision of the State Law. Other state statutes are also claimed to have been violated by respondent, but it is unnecessary to consider them. Respondent's defense of unseaworthiness of the Clark must be overruled, for the evidence shows that at the beginning of the trip it was known by the charterer that she was in a leaky condition.

The respondent company must be condemned (1) for negligently loading and stowing the cargo in the Clark, and for permitting grain particles to protrude or scatter from the cases; (2) for failure of its representative to protect the cargo by adequately covering it; and (3) for permitting the gasoline engine to be spiked to a box of powder on the Clark and operated or tested in close proximity to the powder in the hold, in consequence of which it was ignited and caused the injury of which libelant complains.

A decree, with costs, may be entered, holding respondent company alone at fault, and providing for the appointment of a commissioner to take proof of the loss and damage and report to this court. So ordered.